WAHL, Respondent,. vs. TRACY and others, Appellants.

*May 11—June 3, 1909.*

*Brokers: Duties: Diligence: Good faith: Purchase of stock: Authority: Revocation: Margins: Breach of authority: Damages.*

1. A broker who accepts employment becomes the agent of the employer, and, being intrusted with money for a special purpose, owes his principal the ordinary fiduciary duties of good faith .nd diligence in carrying out his instructions.

2. A broker employed to purchase is not only to purchase in the manner directed by his principal, with reasonable diligence as to time, but also at the best price obtainable when the purchase is made.  \

:3. A purchaser who has employed a broker to purchase may revoke the authority conferred at any time before the broker has in good faith acted upon the order. '

4. Where a customer delivers money to a broker to purchase designated stocks, and the broker, in violation of his instructions, acquires a right to obtain stocks corresponding with the customer's order by putting up margins, it does not follow that it makes no difference to the customer that the transaction is not identical with his directions.

5. Where a broker purchases property for his principal for full cash consideration, the property from the time of the purchase is in the broker's hands free from liability to the general creditors of the. broker, and the broker cannot dispose of it to any person having knowledge of the customer's rights therein, nor to an innocent purchaser, without subjecting the broker to penal .liability.

6. Where a stock broker who received his customer's money with directions to purchase specific stocks purchases the stocks on margin through another broker, the customer acquires no legal right to the possession of those stocks. The selling broker may retain the stocks in his own name, unseparated and unidentified, and exact payment of the balance of the purchase price before delivery. He may also dispose of them in his own name at any time, and, when custom so authorizes, hypothecate them with others, and hence, in case of insolvency of the selling broker, arises liability that the customer can only acquire the particular stocks by paying a second time.

7. A broker, directed and authorized to acquire a clear title to stocks with money placed with him by a customer, does not execute his authority by a purchase on margin through another broker.

8. In such case the customer, after notice of his principal's acts, may revoke his order and demand return of his money.

9. Where a customer placed with a broker the money necessary to purchase certain stocks, and the broker, in violation of his instructions, purchases these stocks on margin through another broker, the first broker does not execute his customer's order until he actually acquires full title to the stocks.

10. In such situation, if the market value had depreciated when the broker actually acquires full title, he has in his hands an amount of his customer's money which it is not necessary to expend and which it is his duty to return, and for which the customer may maintain an action.

MARSHALL, J., WINSLOW, C. J., and BARNES, J., dissent.

APPEAL from an order of the circuit court for Milwaukee county: WARREN D. TARRANT, Circuit Judge. *Affirmed.*

Defendants appeal from order overruling a demurrer to the complaint, which alleges that the plaintiff, a surgeon, and unfamiliar with dealings in stocks, between the 6th and 20th day of January, 1908, placed in the hands of the defendants, who were stock brokers in New York, the sum of $12,800, with direction to purchase certain specified stock at the market price, for cash, such deposit being sufficient for that purpose; that defendants, in violation of the instructions and direction given by plaintiff, and in violation of the trust and fiduciary relation between them, gave an order to another broker or brokers to purchase a corresponding amount of the specified stocks, together with other stocks, for said defend-

ants, on margin, in blank, they having said stock or securities transferred or delivered to the plaintiff; that they applied in payment of such margin only $3,000 and retained and appropriated the balance of plaintiff's deposit to their uses; that defendants fraudulently represented to plaintiff that, at all times up to the 18th day of February, they had actually purchased and fully paid for the stocks ordered for him, and that delivery to him was delayed only to enable transfers on the books of the company; that not until said 18th day of February did plaintiff learn that defendants had not purchased stocks as directed, but had made the unauthorized purchase on margins through other brokers; that he then demanded of the defendants the stocks which he had ordered purchased, and they accordingly delivered to him on February 28th certificates of stock for that amount; and that between the time of giving the order for the purchase of said stocks and such delivery of stock certificates to the plaintiff, the market price thereof depreciated $1,100, for which amount recovery was demanded.

For the appellants there was a brief signed by *Jackson B. Kemper,* counsel, and oral argument by *Mr. Kemper.*

*Christian Doerfler,* for the respondent.

DODGE, J.    It is of course obvious, and appellants in effect concede, that the complaint categorically alleges a breach by the defendants of their duty to the plaintiff assumed by them by the acceptance of employment as brokers.    By such acceptance they became agents of the plaintiff and, being intrusted with his money for a special purpose, owed to him the ordinary fiduciary duties of good faith and due diligence in carrying out his instructions. *Hill v. Am. S. Co.* 107 Wis. 19, 81 N. W. 1024, 82 N. W. 691; *Isham v. Post,* 141 N. Y. 100, 35 N. E. 1084; 1 Dos Passos, Stock Brokers (2d ed.) 218 *et seq.*    The argument of appellants is, however, that no damage has resulted to the plaintiff by reason

of the failure to purchase stocks exactly as directed, for, had defendants done so, such stocks would have depreciated to the same extent by February 18th, and the effect upon plaintiff would have been the same. We think this contention is too technical and narrow to protect an agent who abuses his fiduciary relation from being called to account. The complaint shows, if nothing more, that the defendants have misappropriated to their own uses over $9,800 of the plaintiff's money for a period of about a month, for which alone would result liability at least for interest, as a profit gained by a trustee through his own wrong. But we think the facts alleged show other pecuniary injury to the plaintiff which would not have resulted from exact performance of defendants' duty. That duty was, of course, not only to purchase in the manner directed by the plaintiff, with reasonable diligence as to time, but also to purchase at the best price obtainable whenever the purchase was made, if there was a fixed market price. *Thompson v. Meade,* 7 T. L. Rep. 698; *Smith v. New York S. & P. C. H. Co.* 70 Hun, 597, 25 N. Y. Supp. 261; *Taussig v. Hart,* 58 N. Y. 425; *Larrabee v. Badger,* 45 Ill. 440; 1 Dos Passos, Stock Brokers (2d ed.) 207. Meanwhile, and until the broker had in good faith acted upon the order, plaintiff had the right of revocation. *Sibbald v. Bethlehem I. Co.* 83 N. Y. 378; *Rees v. Pellow,* 97 Fed. 167. We can view the situation in no other light than that defendants failed to act on plaintiff's order in January, when the money was delivered to them. Their claim is that by putting up margins they acquired at least a right to obtain stock corresponding with plaintiff's order, and that it makes no difference to plaintiff that the transaction was not identical with his direction. With this contention we cannot agree. Had the defendants purchased this stock for the plaintiff for full cash consideration, the same would have been his property in their hands as his agents from the time of such purchase, free from liability to the general creditors of the defendants

and which they could not dispose of to any person having knowledge of plaintiff's rights therein, and not even to an innocent purchaser without subjecting themselves to penal liability. *Richardson v. Shaw,* 209 U. S. 365, 28 Sup. Ct. 512. The rights of one for whom stocks are purchased by a broker for down payment with the client's money present none of the complicated questions as to the rights of the broker in stocks purchased for his client "on margin" discussed in some of the cases cited. When the defendants in fact purchased on margin through another broker a similar amount of stock, the situation became very different. The plaintiff acquired no right of possession to that stock, whatever legal title the defendants may have acquired; the selling broker had a right, the sale to defendants being on margin, to retain it in his own name, unseparated and unidentified, and to exact payment of the balance of the purchase price before delivery. His retention of it in his own name made it entirely possible for him to dispose of it at any time, and, under the customs in New York, he had a right to hypothecate it with others by reason of his large pecuniary interest therein. 1 Dos Passos, Stock Brokers (2d ed.) 251; *Skiff v. Stoddard,* 63 Conn. 198, 26 Atl. 874, 28 Atl. 104, 21 L. R. A. 112; *La Marchant v. Moore,* 150 N. Y. 209, 44 N. E. 770; *Markham v. Jaudon,* 41 N. Y. 235. Thus, if defendants had become insolvent at any time, plaintiff could only acquire this particular stock by paying for it again in large part; besides which, of course, the selling brokers had the right, at any time when, by fluctuations in the price of the stock, the market value was reduced to the amount of the unpaid purchase price, to sell the stock completely and cut plaintiff off from all rights therein.

It seems to us very clear that an agent directed and authorized to acquire a clear and complete title to property, with money placed in his hands for the purpose, does not in any respect execute his authority by acquiring such a fragmentary, imperfect, and perilous right therein as this. We deem

it clear that had plaintiff, after the transaction, been notified of its details, he could have ignored it completely, revoked his order, and demanded return of his $12,800. When he was prevented from enjoying or exercising that right by the fraudulent misrepresentations of the defendants, he could not be prejudiced therein as against them. He had the right at all times to the refund of his money. By fraud of the defendants he was prevented from knowing of or exercising that right. As a result it must be deemed that, until the agent's authority was executed by the actual acquirement of full title to the stock for him, the defendants were in possession of plaintiff's money under authority to purchase the specified stock at the best price obtainable. When on February 18th they did so acquire the stock, they for the first time executed plaintiff's order. At that time the market value of the stock for which they could have obtained it was $1,100 less than the sum which plaintiff had placed in their hands. They had no right to purchase at more than the market price or to turn over stock already held by them. The only logical conclusion is that defendants have in their hands that amount of plaintiff's money which they did not need to expend and which it is their duty to return to him and which he has a right to recover in an action against them.

It is suggested, with much force, that the same liability must result from another view of the transaction, namely: It being defendants' duty to purchase this stock for plaintiff and hold it as his, if their dealing with the other broker was a purchase for plaintiff, as contended by the appellants, and did vest title in him, then it was a misappropriation of his property when the defendants placed it with the selling broker to hold in pledge for their debts. It was an effective disposal of the stock by the defendants so that plaintiff was in effect deprived of it. Under such circumstances it has uniformly been held that the guilty agent is liable for the market price of the stock on the day that he so unlawfully

disposed of it, and that he cannot tender after-acquired stock in discharge of such liability; at most, that the newly acquired stock can be delivered only in mitigation of damages to the extent of its market price at the time of delivery to the principal. 1 Dos Passos, Stock Brokers (2d ed.) 258, 276; *Taussig v. Hart,* 58 N. Y. 425; *Langton v. Waite,* L. R. 6 Eq. 165; 28 Am. & Eng. Ency. of Law (2d ed.) 734.

In view of the opinion we have already expressed, that the margin purchase by defendants through another broker was not a purchase for the plaintiff, we need not decide as to the efficacy of the last-stated line of reasoning. It seems, however, to be well supported by authority and to result in a liability if the defendants' contention was sustained that the stock became the plaintiff's at the time of the original transaction.

*By the Court.*—Order overruling demurrer is affirmed.

MARSHALL, J. (*dissenting*). It seems to me the court, in the decision of this case, has overlooked the fundamental principles governing the subject of damages for breach of contract and the principles governing the relation of principal and agent.

The situation in brief is this: Respondent employed the appellants as brokers to purchase for him at market a specified number of shares of specified stock, depositing with them the requisite amount of money to pay in full therefor, leaving them free to obtain the stock in the usual course of business on the exchange. They executed the order through another broker, violating the precise obligations of the contract, if at all, by purchasing the stock through the secondary broker on margin instead of themselves and outright, but reported the transaction in a way to indicate the contrary, yet secured the stock for respondent at market as contemplated by the contract, though the transfer was not made on the books of the corporation except as hereafter stated. Later and after re-

spondent was informed of the real state of the case he demanded delivery of the stock and thereafter obtained the same, duly transferred. In the meantime, of which respondent was fully advised, the stock depreciated in market value, but respondent was not prevented from reselling the same. Upon discovering that it had not been transferred to him he might have revoked the order and demanded back his money, but instead of so doing he elected to take the property in accordance with the purchase and obtained the same. So, in the ultimate, he secured the stock at the market price thereof when the same should have been transferred on the books of the corporation. He was not made poorer to the amount of a penny by the irregularity in the transaction, nor were appellants to that extent enriched by such irregularity. They, to be sure, had the benefit, during the period of delay, of the use of the deposit made to pay for the stock less the amount paid by the secondary broker as the margin, but in turn, of course, were charged by him with the use to the same amount.

Now conceding there was an irregularity in the transaction constituting a breach of contract, the recoverable damages—there being no special circumstances in the transaction brought home to the respondent at the time of making the contract varying the ordinary rule, nor any special circumstance at all, so far as appears by the complaint—were limited to such as "may reasonably be considered to have been in contemplation by both parties at the time of making of the contract as the probable result of the breach of it." *Hadley v. Baxendale,* 9 Exch. 341; *Cockburn v. Ashland L. Co.* 54 Wis. 619, 12 N. W. 49; *Guetzkow Bros. Co. v. A. H. Andrews & Co.* 92 Wis. 214, 218, 66 N. W. 119; *Serfling v. Andrews,* 106 Wis. 78, 80, 81 N. W. 991; *Northern S. Co. v. Wangard,* 123 Wis. 1, 11, 100 N. W. 1066. The rule stated is universal. The idea of it is that there can be no damages in contemplation of law for breach of contract except actual pecuniary loss and such as, in view of all the circumstances

known to both parties at the inception of the contract, may be reasonably said to have been then contemplated as might naturally arise from its breach.   Were there any such damages in this case?   If there were, I am utterly unable to discover them.

There is nothing to show that respondent could have sold the stock at a higher than the purchase price had he wanted to during the period of delay.   Any such opportunity is substantially negatived.   There is nothing to show that respondent would have sold the stock during the period of delay before the depreciation occurred and thus prevented loss by depreciation.   No complaint is made on that score.   There is nothing to show that respondent by reason of the delay had to obtain the stock at a higher price than the market at the time the order should have been fully executed.   He could have gone into the market during such period and obtained the desired stock at a less price than the value at the time the order should have been fully executed, and, since he persisted in his desire for the stock, in case he could not have obtained the same, as contemplated, if it had advanced in price his damages would have been the difference between the market at the time the order should have been executed and what he could have obtained the same for by the exercise of ordinary diligence in the open market.   *Kelley, M. & Co. v. La Crosse C. Co.* 120 Wis. 84, 90, 97 N. W. 674.   So, in any view that can be taken of the facts, the respondent was not injured in any way, neither were the appellants benefited in any way, in a pecuniary sense, under the rule for determining legal damages which I suppose to be universal and well known to every court.   It is not referred to in terms or in effect in the court's opinion.   The theory seems to be that though respondent obtained just what he contracted for and at the very price he agreed to give, he can, because of the mere irregularity in the execution of his order, obtain as damages the difference between the agreed price and the value

when he obtained possession of the property.    I know of no principle or precedent justifying such theory.

The court suggests that, upon discovering the irregularity, respondent might have refused to take the stock and recovered back his money.    Granted, but he did not choose to take that course, but rather to stand by the contract and demand and obtain the stock.   So that suggestion instead of supporting the decision, in my judgment, condemns it as clearly wrong.

The court further suggests some contingencies upon which damages might have accrued, such as if the defendants had become insolvent during the period of delay respondent could only have acquired the stock by paying for it again to the second broker.   Granted, for the purposes of the case, but nothing of that sort occurred.   Legal damages are never to be predicated on mere possibilities as to what might have, but did not, in fact, occur.

Again, the court proceeds upon the theory that appellants obtained the stock, not when the order was irregularly executed but when it passed from the secondary broker to them. That is a technical way of looking at the matter.   They did not purchase the stock at that time but at the time the secondary broker executed the order.   The stock cost them the market price when the order, in any view of the case, should, in due course, have been executed.   They did not go into the market at the late day and buy the stock at a less price, by $1,100, than the prevailing price when the order should have been executed.   For aught that appears they carried, from the time the order, in due course, should have been executed, certificates of stock indorsed in blank sufficient to satisfy it. It was not necessary to pass any particular certificate through the transfer office to obtain registration for respondent of the stock going to him.   So long as he obtained the number of shares ordered and at the agreed price and, since it does not appear that he desired to resell the stock, did not lose any dividend declared or paid in the meantime, nor lose any prof-

its by reason of being prevented from selling the stock during the period of delay at a higher than the market price when the order was placed and suffered no loss by reason of depreciation by reason of being prevented from selling before the depreciation occurred, he suffered no pecuniary loss. Speculating on what might have but did not occur and predicating damages thereon, in my judgment, is outside of legal principles.

The opinion of the court further proceeds upon the theory that when respondent finally demanded and obtained the stock he was ignorant of the fact that the order had been executed through the secondary broker in the irregular way and so prevented from repudiating the transaction and demanding back his money at a time when the amount thereof was $1,100 in excess of the value of the stock, but, such is not the case as is clearly shown by the complaint. The pleader states that he "waited until the 18th day of February, 1908, for the delivery of said stocks, and then for the first time discovered that said stocks and certificates up to that time had not been purchased in accordance with the instructions . . . and . . . thereupon again demanded a delivery of said stock and certificates, and that the same were actually delivered on or about the 20th day of February, 1908." Thus, manifestly, the idea that respondent was prevented from electing to save himself from loss by reason of being induced to take the stock in ignorance of the irregularity, is repelled by the complaint.

Viewing the situation from the standpoint of principal and agent, in my judgment there is a fatal infirmity in the court's decision, in this: It is familiar law that if a person employed as agent to do a particular thing exceeds his authority and the principal, nevertheless, with full knowledge of the facts, accepts the result, as in this case, he thereby ratifies the unauthorized act and makes the situation the same as if authority were originally given as broad as that exercised. *McDermott v. Jackson,* 97 Wis. 64, 76, 72 N. W. 375. As indicated, it is disclosed by the complaint that respondent, with

knowledge of all facts known by him when the action was commenced, demanded and received the stock as that which appellants contracted to obtain for him, making no claim for damages because of its not having been transferred to him upon the books of the corporation at an earlier date. The action was commenced about a month after the transaction was closed and evidently was an afterthought, resorted to for the purpose of taking advantage of the irregularity in executing the order, which, by familiar rules of law, had been waived, as a means of recouping the damages caused by an unfortunate speculation, not caused to any extent by appellants' wrong. Had the stock advanced in price during the period of delay he would have had the full benefit thereof, and had the stock not been delivered he could have recovered full damages. Had the stock advanced after the transfer to him before the action was commenced to the market price when the order should, in due course, have been executed, doubtless this litigation would not have been commenced. If since the action was commenced it has advanced to a price in excess of the purchase price by the secondary broker, as we may well apprehend it has and that respondent now has the stock, the benefit is his. In short, he has all the advantages of the purchase which he could have had in any event, under the circumstances of his own conduct, and has suffered no disadvantage by reason of the irregularity, so far as appears, not even loss of opportunity to take advantage of any breach which he did not waive.

I cannot discover any ground for sustaining the complaint, and so the decision overruling the demurrer should be reversed.

WINSLOW, C. J. I concur in the views of Mr. Justice MARSHALL.

BARNES, J. I concur in the dissenting opinion of Mr. Justice MARSHALL.